| Fill in this information to identify the case: |
| --- |

United States Bankruptcy Court for the:

__Western__ District of __Wisconsin__
(State)

Case number (*If known*): _____ Chapter __11__

☐ Check if this is an
amended filing

## Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy    04/22

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known).  For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

**1. Debtor's name**

HealthMyne, Inc.

**2. All other names debtor used in the last 8 years**

Include any assumed names, trade names, and *doing business as* names

Vital Informatics, Inc.

**3. Debtor's federal Employer Identification Number (EIN)**

4 6 - 1 7 4 7 1 5 0

**4. Debtor's address**

Principal place of business

918 Deming Way, 3rd FL
Number    Street

Madison    WI    53717
City    State    ZIP Code

Dane
County

Mailing address, if different from principal place of business

Number    Street

P.O. Box

City    State    ZIP Code

Location of principal assets, if different from principal place of business

Number    Street

City    State    ZIP Code

**5. Debtor's website (URL)**

www.healthmyne.com

Debtor    __HealthMyne, Inc._____    Case number *(if known)*_____ _
      Name

---

**6.  Type of debtor**

- ☒ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))
- ☐ Partnership (excluding  LLP)
- ☐ Other. Specify: _____

---

**7.  Describe debtor's business**

A. *Check one:*

- ☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))
- ☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))
- ☐ Railroad (as defined in 11 U.S.C. § 101(44))
- ☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))
- ☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))
- ☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))
- ☒ None of the above

B. *Check all that apply:*

- ☐ Tax-exempt entity (as described in 26 U.S.C. § 501)
- ☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)
- ☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See
   http://www.uscourts.gov/four-digit-national-association-naics-codes .

   _5_ _4_ _1_ _7_

---

**8.  Under which chapter of the Bankruptcy Code is the debtor filing?**

*Check one:*

- ☐ Chapter 7
- ☐ Chapter 9
- ☒ Chapter 11. *Check all that apply*:
    - ☒ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725 (amount subject to adjustment on 4/01/25 and every 3 years after that).
    - ☒ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D). If the debtor is a small business debtor, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if all of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).
    - ☒ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and it chooses to proceed under Subchapter V of Chapter 11.
    - ☐ A plan is being filed with this petition.
    - ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).
    - ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.
    - ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.
- ☐ Chapter 12

---

**9.  Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

- ☒ No
- ☐ Yes.  District _____  When _____  Case number _____
                                          MM / DD / YYYY
                District _____  When _____  Case number _____
                                            MM / DD / YYYY

---

Debtor    <u>HealthMyne, Inc.</u>       Case number *(if known)* _____
      Name

---

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

☒ No

☐ Yes.   Debtor _____   Relationship _____

District _____   When _____

                                              MM / DD / YYYY

Case number, if known _____

---

**11. Why is the case filed in *this* district?**

*Check all that apply:*

☒ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☐ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

---

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☒ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** *(Check all that apply.)*

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?** _____
                         Number       Street

_____
City                        State ZIP Code

**Is the property insured?**

☐ No

☐ Yes. Insurance agency _____

Contact name _____

Phone _____

---

## Statistical and administrative information

**13. Debtor's estimation of available funds**

*Check one:*

☒ Funds will be available for distribution to unsecured creditors.

☐ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

---

**14. Estimated number of creditors**

☒ 1-49           ☐ 1,000-5,000           ☐ 25,001-50,000
☐ 50-99         ☐ 5,001-10,000          ☐ 50,001-100,000
☐ 100-199       ☐ 10,001-25,000        ☐ More than 100,000
☐ 200-999

---

Debtor    **HealthMyne, Inc.**
Name

Case number *(if known)*_____

| | | |
|---|---|---|
| **15. Estimated assets** | ☐ $0-$50,000<br>☐ $50,001-$100,000<br>☐ $100,001-$500,000<br>☐ $500,001-$1 million | ☒ $1,000,001-$10 million<br>☐ $10,000,001-$50 million<br>☐ $50,000,001-$100 million<br>☐ $100,000,001-$500 million | ☐ $500,000,001-$1 billion<br>☐ $1,000,000,001-$10 billion<br>☐ $10,000,000,001-$50 billion<br>☐ More than $50 billion |
| **16. Estimated liabilities** | ☐ $0-$50,000<br>☐ $50,001-$100,000<br>☐ $100,001-$500,000<br>☐ $500,001-$1 million | ☒ $1,000,001-$10 million<br>☐ $10,000,001-$50 million<br>☐ $50,000,001-$100 million<br>☐ $100,000,001-$500 million | ☐ $500,000,001-$1 billion<br>☐ $1,000,000,001-$10 billion<br>☐ $10,000,000,001-$50 billion<br>☐ More than $50 billion |

### Request for Relief, Declaration, and Signatures

**WARNING --** Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  05/15/2022
MM / DD / YYYY

X _Rose Higgins, CEO_
Signature of authorized representative of debtor

_ROSE HIGGINS, CEO_
Printed name

Title  **Authorized Person**

**18. Signature of attorney**

X _____
Signature of attorney for debtor

Date _____
MM / DD / YYYY

**Justin M. Mertz**
Printed name
**Michael Best & Friedrich LLP**
Firm name
**790 N. Water Street, Suite 2500**
Number    Street
**Milwaukee**        **WI**    **53202**
City                State    ZIP Code
**414-225-4972**        **jmmertz@michaelbest.com**
Contact phone            Email address
**1056938**            **WI**
Bar number            State

Debtor    HealthMyne, Inc.
         _____          Case number (if known)_____
         Name

| 15. Estimated assets | ☐ $0-$50,000 | ☒ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
|---|---|---|---|
| | ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| | ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| | ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

| 16. Estimated liabilities | ☐ $0-$50,000 | ☒ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
|---|---|---|---|
| | ☐ $50,001-$100,000 | ☐ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| | ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| | ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

### Request for Relief, Declaration, and Signatures

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

| 17. Declaration and signature of authorized representative of debtor | The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition. |
|---|---|

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  _____
            MM  / DD / YYYY

✖  _____          _____
   Signature of authorized representative of debtor      Printed name

   Title  Authorized Person

| 18. Signature of attorney | ✖  _____     Date  05/15/22 |
|---|---|

   Signature of attorney for debtor                              MM / DD / YYYY

   Justin M. Mertz
   Printed name
   Michael Best & Friedrich LLP
   Firm name
   790 N. Water Street, Suite 2500
   Number      Street
   Milwaukee                                        WI          53202
   City                                             State       ZIP Code
   414-225-4972                                     jmmertz@michaelbest.com
   Contact phone                                    Email address

   1056938                                          WI
   Bar number                                       State

## UNANIMOUS WRITTEN CONSENT
## OF THE BOARD OF DIRECTORS
## OF
## HEALTHMYNE, INC.

**THE UNDERSIGNED**, being all of the members of the Board of Directors (the "***Board***") of HealthMyne, Inc., a Delaware corporation (the "***Corporation***"), do hereby waive any and all requirements of notice of the time, place and purpose of a meeting and consent to the following actions and adopt the following resolutions by written consent without a meeting pursuant to Section 141(f) of the General Corporation Law of the State of Delaware and the Corporation's Bylaws effective as of May 10, 2022:

**WHEREAS**, on November 3, 2021 (the "***Sale Engagement Date***"), the Corporation engaged Convergence Healthcare Advisors LLC as an exclusive agent to assist the Corporation in the potential sale of the Corporation's capital stock or business assets to an interested acquiror (the "***Sale Process***");

**WHEREAS**, since the Sale Engagement Date, the Board has met regularly (in some cases, on a weekly basis) to discuss any progress related to the Sale Process;

**WHEREAS**, to date, the Corporation has been unable to procure a written letter of intent, term sheet, purchase agreement, or stalking horse agreement, despite seeing interest from numerous parties, a number of which remain interested in potentially acquiring the Corporation or its business assets;

**WHEREAS**, given the Corporation's current cash position and in furtherance of a continued effort to maximize return to the Corporation's stockholders (the "***Stockholders***") and sell the Corporation or its business assets as a going concern through an auction process, the Board deems it in the best interests of the Corporation and its Stockholders that the Corporation file a voluntary petition with the United States Bankruptcy Court pursuant to Subchapter V of Chapter 11 of Title 11 of the United States Code (collectively, the "***Bankruptcy Proceedings***");

**WHEREAS**, the Corporation previously entered into that certain Convertible Promissory Note Purchase Agreement effective as of September 24, 2021 and as amended on March 10, 2022 among the Corporation and the investors named therein (collectively, the "***Purchase Agreement***"), whereby the Corporation issued unsecured convertible promissory notes (collectively, the "***Notes***") to the investors in exchange for investments equal to an aggregate principal amount of $3,806,225.88, of which $3,306,225.88 has been invested to date (the "***Financing***");

**WHEREAS**, the Board deems it in the best interest of the Corporation and its Stockholders that the Corporation amend the Purchase Agreement, in substantially the form attached hereto as Exhibit A (the "***Purchase Agreement Amendment***"), to accelerate the investment of certain funds to the Corporation to fund its statutory liabilities and any necessary costs and expenses in connection with the Bankruptcy Proceedings, and to grant certain investors a subordinated security interest in the Corporation's assets in connection therewith (the "***Financing Acceleration***");

**WHEREAS**, pursuant to Section 144 of the Delaware General Corporation Law, no contract or transaction between the Corporation and one or more of its directors or officers or any other corporation, partnership, association or other organization in which one or more of the directors or officers of the Corporation is a director or officer of, or has a financial interest in (any such party is referred to herein individually as an "*Interested Party*," or collectively as the "*Interested Parties*," and any such contract or transaction is referred to herein as an "*Interested Party Transaction*"), shall be void or voidable solely for that reason, or solely because the director or officer is present at or participates in the meeting of the Board which authorized the Interested Party Transaction or solely because the vote of any such director is counted for such purpose, if: (i) the material facts as to the relationship or interest and as to the contract are disclosed or are known to the Board, and the Board in good faith authorizes the contract or transaction by affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum, (ii) the material facts as to the relationship or interest and as to the contract are disclosed or are known to the Stockholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the Stockholders, or (iii) the contract or transaction is fair as to the Corporation as of the time it is authorized, approved or ratified by the Board or the Stockholders;

**WHEREAS**, it is hereby disclosed or made known to the Board that (i) Scott Button is the Managing Director of Venture Investors Early Stage Fund V, L.P., which is participating in the Financing Acceleration, (ii) Dan Malven is the Managing Director of 4490 Ventures, L.P., which is participating in the Financing Acceleration, and (iii) John Kuelper is the Managing Director of CHV IV, L.P., which is participating in the Financing Acceleration, such that each of Mr. Button, Mr. Malven and Mr. Kuelper, who are all directors of the Corporation, may be considered an Interested Party, and the Financing Extension may be an Interested Party Transaction;

**WHEREAS**, the Board is aware of the material facts related to the Financing Acceleration and has had an adequate opportunity to ask questions regarding, and investigate the nature of, the relationships and/or interests of the Interested Parties with and in the Corporation in connection with the Financing Acceleration;

**WHEREAS**, after careful consideration, the Board has determined that the terms and conditions of the proposed Financing Acceleration are just and equitable and fair as to the Corporation and the Stockholders of the Corporation and that it is in the best interests of the Corporation and the Stockholders to enter into the documents pursuant to which the Financing Acceleration shall be consummated, subject to the specific terms and conditions contained therein;

**NOW, THEREFORE, BE IT**

**Bankruptcy Proceedings**

**RESOLVED**, that the Board has determined that it is advisable and in the best interests of the Corporation and its Stockholders to enter into the Bankruptcy Proceedings and that, subject to

ACTIVE/112224262.1

the approval of the requisite Stockholders of the Corporation, entering into the Bankruptcy Proceedings be, and it hereby is, approved and adopted in all respects;

**RESOLVED FURTHER**, that the Board hereby directs the officers of the Corporation to solicit the consent of the Stockholders to authorize the Bankruptcy Proceedings;

**RESOLVED FURTHER**, that, upon the approval of entering into the Bankruptcy Proceedings by the Stockholders, the form, terms and provisions of, and the transactions contemplated by the Bankruptcy Proceedings, including, without limitation, those documents as necessary to perfect the filing of a voluntary Chapter 11 bankruptcy case on behalf of the Corporation (collectively, the "***Bankruptcy Documents***") be, and they hereby are, authorized and approved in all respects, and that the officers (including, without limitation, Rose Higgins as the Corporation's Chief Executive Officer) (the "***Authorized Officers***") of the Corporation be, and each of them hereby is, acting jointly or singly, authorized, empowered and directed, in the name and on behalf of the Corporation, to execute, deliver and perform the Corporation's obligations under the Bankruptcy Documents, with such changes therein and additions or amendments thereto as the Authorized Officers executing the same on behalf of the Corporation shall approve, the execution thereof by such Authorized Officers to be conclusive evidence of such approval;

**RESOLVED FURTHER**, that, upon the approval of the entering into the Bankruptcy Proceedings by the Stockholders, the Authorized Officers are authorized and directed by the Board to appear in all Chapter 11 or related proceedings on behalf of the Corporation or designate such appropriate person; and

**RESOLVED FURTHER**, that the Corporation is authorized and directed to employ the law firm of Michael Best & Friedrich LLP to represent the Corporation as its bankruptcy and general counsel, and to employ other attorneys and professionals as may be necessary for the Corporation in furtherance of the Bankruptcy Proceedings.

## Financing Acceleration

**RESOLVED**, that the form, terms and provisions of, and the transactions contemplated by Purchase Agreement Amendment be, and they hereby are, approved and adopted in all respects;

**RESOLVED FURTHER**, that the form, terms and provisions of, and the transactions contemplated by the Purchase Agreement and the Notes, as amended by the Purchase Agreement Amendment (collectively, the "***Transaction Documents***") be, and they hereby are, authorized and approved in all respects, and that the officers of the Corporation be, and each of them hereby is, acting jointly or singly, authorized, empowered and directed, in the name and on behalf of the Corporation, to execute, deliver and perform the Corporation's obligations under the Transaction Documents and the grant any security interests thereunder, in substantially the form attached hereto, with such changes therein and additions or amendments thereto as any officer or officers of the Corporation executing the same on behalf of the Corporation shall approve, the execution thereof by such officer or officers to be conclusive evidence of such approval; and

**RESOLVED FURTHER**, that the officers of the Corporation be, and each of them hereby

is, acting jointly or singly, authorized, empowered and directed, in the name and on behalf of the Corporation, to execute, deliver and perform the Corporation's obligations under any and all other documents, agreements, certificates, instruments and filings required to be entered into or contemplated by, and to make such payments as are required under, the Transaction Documents and to do or cause to be done any and all further acts and things as any officer may deem necessary, advisable, appropriate or convenient in connection with the execution and delivery of, and the consummation of the transactions contemplated by, the Transaction Documents (including, without limitation, granting a security interest in any collateral specified in the Transaction Documents), the execution and delivery or any act by any such officer in connection with the foregoing matters shall conclusively establish his authority therefor from the Corporation and the approval and ratification by the Corporation of the Transaction Documents.

### Issuance of Stock

RESOLVED, if any Securities are to be issued pursuant to the terms of the Purchase Agreement (as amended by the Purchase Agreement Amendment), that the Corporation issue and sell up to that number of applicable Securities to the Investors as set forth in the Purchase Agreement (as amended by the Purchase Agreement Amendment), and that in effecting delivery of such Securities, the Board hereby authorizes and directs each of the officers of the Corporation to issue or cause to be issued such Securities from the authorized but unissued Securities of the Corporation, and when issued in accordance with the terms of the Purchase Agreement (as amended by the Purchase Agreement Amendment), such Securities shall be validly issued, fully paid and non-assessable.

### Reservation of Common Stock

RESOLVED, that a number of shares of Common Stock be reserved for issuance upon exercise of the conversion rights of any issued and outstanding Conversion Securities (as defined in the Purchase Agreement), as set forth in the Restated Certificate, and when issued in accordance with the Restated Certificate, such shares of Common Stock shall be validly issued, fully paid and non-assessable.

### Securities Filings

RESOLVED that the Notes and Securities issued thereunder shall be offered, sold and issued in reliance upon any applicable exemption from registration provided by the Securities Act of 1933, as amended, and any applicable exemption under applicable state blue sky laws, and that the officers of the Corporation (including the Secretary of the Corporation) be, and each of them hereby is, authorized and directed, for and on behalf of the Corporation, to execute and file any forms, certificates, notices or other documents that are necessary or appropriate pursuant to federal or state securities laws.

### General Authorization

RESOLVED, that the officers of the Corporation be, and each of them hereby is, singly or jointly, authorized, empowered and directed, in the name and on behalf of the Corporation, to take or cause to be taken any and all actions and to make all payments as may be necessary, appropriate,

convenient, proper or advisable in furtherance of, or to effectuate the transactions contemplated by, the foregoing resolutions, the approval thereof by any such officer conclusively establishing his or her authority therefor from the Corporation; and

**RESOLVED FURTHER**, that all actions previously taken by any director, officer, employee, agent or attorney of the Corporation in furtherance of, or to effectuate the transactions contemplated by, the foregoing resolutions are hereby adopted, ratified, confirmed and approved in all respects as the acts and deeds of the Corporation.

[Signature Page Follows]

- 5 -

**IN WITNESS WHEREOF**, the undersigned have executed this unanimous written consent of the Board as of the date first set forth above, which written consent may be executed in one or more counterparts, including by signature pages provided by facsimile or other electronic transmission, each of which shall be deemed an original, all of which shall constitute one and the same instrument.  This action shall be filed with the minutes of the proceedings of the Board and shall be effective as of the date first above written.

**DIRECTORS:**

*Scott Button*

Scott Button                                          5/10/2022
                                                      Date

*Rose Higgins*

Rose Higgins                                          5/10/2022
                                                      Date

*Mary Margaret Huizinga*

Mimi Huizinga                                         5/10/2022
                                                      Date

*John Kuelper*

John Kuelper                                          5/10/2022
                                                      Date

*T. Rockwell Mackie*

T. Rockwell Mackie                                    5/11/2022
                                                      Date

*Dan Malven*

Dan Malven                                            5/10/2022
                                                      Date

# **EXHIBIT A**

PURCHASE AGREEMENT AMENDMENT

Exhibit A
to
Unanimous Written Consent of the Board of Directors

**SECOND AMENDMENT**
**TO**
**CONVERTIBLE PROMISSORY NOTE PURCHASE AGREEMENT**

This Second Amendment to Convertible Promissory Note Purchase Agreement (this "***Second Amendment***") amends that certain Convertible Promissory Note Purchase Agreement effective as of September 24, 2021, as amended pursuant to that certain First Amendment dated March 10, 2022 (collectively, the "***Purchase Agreement***") among HealthMyne, Inc., a Delaware corporation (the "***Company***") and the investors named therein, and is hereby adopted and consented to by the Company and the undersigned Requisite Investors (as defined in the Purchase Agreement) effective as of May 10, 2022 (the "***Effective Date***").  All terms used but not otherwise defined herein shall have the meanings given them in the Purchase Agreement.

**WHEREAS**, pursuant to Section 8.3 of the Purchase Agreement, any waiver or amendment to the Purchase Agreement must be approved by the Company and the Requisite Investors; and

**WHEREAS**, the undersigned Purchasers constitute the Requisite Purchasers.

**NOW, THEREFORE**, in consideration of the mutual promises and agreements herein made and intending to be legally bound hereby, the parties hereto agree as follows:

1.     <u>Modification to Section 1.2</u>.  Effective as of the Effective Date, Section 1.2 of the Purchase Agreement shall be deleted in its entirety and replaced with the following:

"1.2     <u>Maximum Financing Amount</u>.  The maximum aggregate principal amount of Notes to be issued under this Agreement is Four Million Dollars ($4,000,000), unless otherwise agreed to by the Company's Board of Directors (the "***Board***") and the Requisite Investors (as defined herein)."

2.     <u>Modification to Section 2.2</u>.  Effective as of the Effective Date, Section 2.2 of the Purchase Agreement shall be deleted in its entirety and replaced with the following:

"2.2     <u>Subsequent Closings; Tranche Investments</u>.  After the Initial Closing, the Company may sell, pursuant to this Agreement, additional Notes (each an "***Additional Sale***") to one or more existing Investors and/or new Investors mutually agreed upon by the Company and the Requisite Investors (each an "***Additional Investor***") as follows; provided that (a) all Notes sold pursuant to Additional Sales are sold on substantially the same terms as the original sale of Notes under <u>Section 1.1</u> of this Agreement, (b) each Additional Investor will become a party to this Agreement by signing and delivering to the Company a counterpart signature page or a joinder agreement hereto, and upon the Company signing and delivering a counterpart thereto, such investor will become an "***Investor***" hereunder:

(a)     <u>Initial Extension Period</u>.  At any time and from time to time during the thirty (30) day period immediately following the Initial Closing (the "***Initial Extension Period***"), the Company may sell, pursuant to this Agreement, additional Notes to Additional Investors, provided that the aggregate amount of principal due under the Notes issued and sold pursuant to this Agreement during the Initial Extension Period does not exceed $3,000,000.

(b)     <u>Tranche Investments</u>.  After the expiration of the Initial Extension Period (the "***Tranche Period***"), the Company may sell, pursuant to this Agreement,

additional Notes to Additional Investors, provided that (i) the aggregate amount of principal due under the Notes issued and sold pursuant to this Agreement during the Tranche Period does not exceed $1,000,000, and (ii) such Additional Sales are made pursuant to the provisions set forth below in this Section 2.2(b).

(1) First Tranche.  At the first Closing during the Tranche Period, each applicable Investor shall deliver to the Company in exchange for the Company's issuance of a new Note for the amount set forth opposite such Investor's name on Exhibit B under the column heading "First Tranche" (the "*First Tranche Investment*").

(2) Second Tranche.  At any time on or before the date that is May 11, 2022, each applicable Investor shall deliver to the Company in exchange for the Company's issuance of a new Note (as modified pursuant to Section 2.2(d) below) for the amount set forth opposite such Investor's name on Exhibit B under the column heading "Second Tranche" (the "*Second Tranche Investment*").

(3) Third Tranche.  At any time on or before the date that is December 31, 2022, each applicable Investor may, in its sole discretion, deliver to the Company in exchange for the Company's issuance of a new Note (as modified pursuant to Section 2.2(d) below) for the amount set forth opposite such Investor's name on Exhibit B under the column heading "Third Tranche" (the "*Third Tranche Investment*").

(c)    Each Additional Sale will take place remotely via the exchange of documents, signatures and funds at such time(s) and place(s) as the Company and the Investors purchasing Notes at such Additional Sale mutually agree upon (each, a "*Subsequent Closing*").  The Initial Closing and each Subsequent Closing are referred to herein as a "*Closing*."

(d)    Notwithstanding the foregoing, each Note executed pursuant to the Second Tranche Investment or Third Tranche Investment shall be secured pursuant to a General Business Security Agreement to be entered into among the Company and each such investor in the form attached hereto as Exhibit C; provided, however, that such Second Tranche Investment and Third Tranche Investment shall remain subject to the obligations set forth pursuant to that certain Subordination Agreement among the Investors and Silicon Valley Bank (the "*Senior Lender*") dated September 24, 2021 (the "*Subordination Agreement*").""

3.    Modification to Exhibit B.  Effective as of the Effective Date, Exhibit B of the Purchase Agreement shall be deleted in its entirety and replaced with the exhibit set forth on Schedule 1 attached hereto.

4.    Addition of Exhibit C.  Effective as of the Effective Date, a new Exhibit C shall be added to the Purchase Agreement, in the form set forth on Schedule 2 attached hereto

5.    No Other Amendments; Reference.  Except as otherwise provided in this Second Amendment, all of the terms, covenants and other provisions of the Purchase Agreement shall continue to

2

be in full force and effect in accordance with their respective terms.  As of the date of this Second Amendment, all references in the Purchase Agreement to the "Agreement" shall refer to the Purchase Agreement, as amended by this Second Amendment.

6. <u>Severability</u>.  If any provision of this Second Amendment is held to be invalid, illegal, or unenforceable, (a) the validity, legality, and enforceability of the remaining provisions of this Second Amendment will not be affected or impaired, and (b) the parties shall negotiate in good faith so as to replace each such invalid, illegal, or unenforceable provision with a valid, legal, and enforceable provision that will, in effect, from an economic viewpoint, most nearly and fairly achieve the effect of the invalid, illegal, or unenforceable provision and the intent of the parties in entering into this Second Amendment..

7. <u>Governing Law</u>.  This Second Amendment shall be governed by the internal law of the State of Delaware without regard to conflict of law principles that would result in the application of any law other than the law of the State of Delaware.

8. <u>Headings</u>.  The descriptive headings of the articles, sections, and subsections of this Second Amendment are for convenience of reference only.  They do not constitute a part of this Agreement and do not affect this Second Amendment's construction or interpretation.

9. <u>Counterparts</u>.  If the parties sign this Second Amendment in counterparts, each counterpart constitutes an original, and all counterparts, collectively, constitute only one agreement.  The signatures of all the parties need not appear on the same counterpart, and delivery of a signed counterpart signature page by fax, electronic mail  (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g.*, www.docusign.com) or other electronic transmission is as effective as signing and delivering an original..

[Signature Page Follows]

IN WITNESS WHEREOF, the undersigned have executed this Second Amendment to the Convertible Promissory Note Purchase Agreement effective as of the Effective Date.

**COMPANY:**

**HEALTHMYNE, INC.**


By:_____
Name:  Rose Higgins
Title:    Chief Executive Officer

IN WITNESS WHEREOF, the undersigned have executed this Second Amendment to the Convertible Promissory Note Purchase Agreement effective as of the Effective Date.

**REQUISITE INVESTORS:**

CHV IV, L.P.

By:   Ascension Ventures IV, LLC
Its:   General Partner

By:_____
Name:
Title:

VENTURE INVESTORS EARLY STAGE FUND V, L.P.

By:   VIESF GP, LLC
Its:   General Partner

By: _____
Name: Scott Button
Title:   Managing Director

4490 VENTURES, L.P.

By:   4490 Ventures GP, L.L.C.
Its:   General Partner

By: _____
Name:  Dan Malven
Title:   Managing Member

[Signature Page to Second Amendment to Convertible Note Purchase Agreement]

**SCHEDULE 1**

**EXHIBIT B**

**SCHEDULE OF INVESTORS**

**Initial Closing:**

| Investor | Amount |
|---|---|
| CHV IV, L.P.<br>c/o Ascension Ventures<br>101 South Hanley Road, Suite 200<br>Clayton, MO 63105<br>Attn:  John Kuelper and Matthew I. Hermann<br>Email:  John.Kuelper@ascension.org, Matthew.Hermann@ascension.org | $1,250,000 |
| Venture Investors Early Stage Fund V, L.P.<br>505 South Rosa Road, Unit 201<br>Madison, WI 53719<br>Attn:  Scott Button<br>Email:  scott@ventureinvestors.com | $625,000 |
| 4490 Ventures, L.P.<br>111 N. Fairchild Street, #240<br>Madison, WI 53703<br>Attn:  Dan Malven<br>Email:  dm@4490ventures.com | $625,000 |
| T. Rock Mackie<br>7763 Solstice Court<br>Verona, WI 3593<br>Email:  trmackie@wisc.edu | $30,000 |
| **TOTAL:** | **$2,530,000** |

ACTIVE/115686961.2

**Subsequent Closing (Initial Extension Period):**

| **Investor** | **Amount** |
|---|---|
| RRK Limited Partnership<br>1112 7th Avenue<br>Monroe, WI 53566<br>Attn: Ryan Kubly<br>Email: Ryan.Kubly@colonybrands.com | $100,000 |
| Kerscher Equity, LLC<br>6172 Burr Oak Way<br>Hudson, OH 44236<br>Attn: Steven Kerscher<br>Email: kerscher.steven@gmail.com | $17,943.08 |
| WIP-Healthmyne II, LLC<br>P.O. Box 45919<br>Madison, WI 53744<br>Attn: Matt Kelly<br>Email: mkelly@vmllc.com | $33,000 |
| Magis Investments, LLC<br>One South Pinckney Street, Suite 700<br>Madison, WI 53703<br>Attn: Gregory J. Lynch<br>Email: gjlynch@michaelbest.com | $5,057.03 |
| Wisconsin Alumni Research Foundation<br>614 Walnut Street 13th Floor<br>Madison, WI 53726<br>Email: gkeenan@warf.org | $120,225.77 |
| **TOTAL:** | **$276,225.88** |

[B-2]

**Subsequent Closing (Tranche Period):**

| Investor | Maximum Principal Amount | First Tranche | Second Tranche | Third Tranche |
|---|---|---|---|---|
| CHV IV, L.P.<br>c/o Ascension Ventures<br>101 South Hanley Road, Suite 200<br>Clayton, MO 63105<br>Attn:  John Kuelper and Matthew I. Hermann<br>Email:  John.Kuelper@ascension.org,<br>Matthew.Hermann@ascension.org | $500,000 | $250,000 | $85,000 | $165,000 |
| Venture Investors Early Stage Fund V, L.P.<br>505 South Rosa Road, Unit 201<br>Madison, WI 53719<br>Attn:  Scott Button<br>Email:  scott@ventureinvestors.com | $250,000 | $125,000 | $42,500 | $82,500 |
| 4490 Ventures, L.P.<br>111 N. Fairchild Street, #240<br>Madison, WI 53703<br>Attn:  Dan Malven<br>Email:  dm@4490ventures.com | $250,000 | $125,000 | $42,500 | $82,500 |
| **TOTAL:** | **$1,000,000** | **$500,000** | **$170,000** | **$330,000** |

[B-3]

**SCHEDULE 2**

**EXHIBIT C**

**FORM GENERAL BUSINESS SECURITY AGREEMENT**

(See attached)

ACTIVE/115686961.2



**BUSINESS**
**W.B.A. | 447 (2/13/18)**
©Wisconsin Bankers Association 2018

## GENERAL BUSINESS SECURITY AGREEMENT
### 1. SECURITY INTEREST

Dated _____

In consideration of any financial accommodation at any time granted by _____

("**Lender**") to _____ ("**Borrower**"),

each of the undersigned ("**Debtor**", whether one or more) grants Lender a security interest in (i) all equipment, fixtures, inventory, documents (including electronic documents), general intangibles, accounts, deposit accounts (unless a security interest would render a nontaxable account taxable and excluding any deposit account used for the sole purpose of making payroll and withholding tax payments and other employee wage and benefits payments and accrued and unpaid employee compensation payments, and any deposit account used soley as an escrow, fiduciary or trust account), contract rights, chattel paper (whether tangible or electronic), patents, trademarks and copyrights (and the good will associated with all registrations and licenses of any of them), instruments, letter of credit rights and investment property, now owned or hereafter acquired by Debtor (or by Debtor with spouse), (ii) all additions and accessions to, and all spare and repair parts, special tools, equipment and replacements for, all software used in, all returned or repossessed goods the sale of which gave rise to, and all accounts arising from the lease of, all of the foregoing, and (iii) all proceeds, supporting obligations, and products of all of the foregoing ("**Collateral**"), wherever located, to secure all debts, obligations and liabilities to Lender arising out of credit previously granted, credit contemporaneously granted and credit granted in the future by Lender to any Debtor, or any Borrower, to any of them and another, or to another guaranteed or endorsed by any of them ("**Obligations**").

### 2. DEBTOR'S WARRANTIES

Debtor warrants and agrees that while any of the Obligations are unpaid:

**(a) Ownership and use.** Debtor owns (or with spouse owns) the Collateral free of all encumbrances and security interests (except Lender's security interest). Chattel paper constituting Collateral evidences a perfected security interest in the goods (including software used in the goods) covered by it, free from all other encumbrances and security interests, and no financing statement is on file or control agreement in existence (other than Lender's) covering the Collateral or any of it. Debtor, acting alone, may grant a security interest in the Collateral and agree to the terms of this Agreement. The Collateral is used or bought for use primarily for business purposes.

**(b) Sale of goods or services rendered.** Each account and chattel paper constituting Collateral as of this date arose from the performance of services by Debtor or from a bona fide sale or lease of goods, which have been delivered or shipped to the account debtor and for which Debtor has genuine invoices, shipping documents or receipts.

**(c) Enforceability.** Each account, contract right and chattel paper constituting Collateral as of this date is genuine and enforceable against the account debtor according to its terms. It and the transaction out of which it arose comply with all applicable laws and regulations. The amount represented by Debtor to Lender as owing by each account debtor is the amount actually owing and is not subject to setoff, credit, allowance or adjustment, except discount for prompt payment, nor has any account debtor returned the goods or disputed liability.

**(d) Due date.** There has been no default as of this date according to the terms of any chattel paper or account constituting Collateral and no step has been taken to foreclose the security interest it evidences or otherwise enforce its payment.

**(e) Financial condition of account debtor.** As of this date Debtor has no notice or knowledge of anything which might impair the credit standing of any account debtor and Debtor will advise Lender upon receipt of any such notice or knowledge affecting Collateral.

**(f) Valid organization.** If a corporation, limited liability company or general or limited partnership, Debtor is duly organized, validly existing and in good standing under the laws of the state of organization and is authorized to do business in Wisconsin.

**(g) Other agreements.** Debtor is not in default under any agreement for the payment of money.

**(h) Authority to contract.** The execution and delivery of this Agreement and any instruments evidencing Obligations have been duly authorized and approved, and will not violate or constitute a breach of Debtor's articles of incorporation or organization, by-laws, partnership agreement, operating agreement or any other agreement or restriction to which Debtor is a party or is subject.

**(i) Accuracy of information.** All information, certificates or statements given to Lender pursuant to this Agreement shall be true and complete when given.

**(j) Name and address.** Debtor's exact legal name is as set forth below Section 5. If Debtor is an individual, Debtor separately provided to Lender the name of Debtor as it is indicated on Debtor's current unexpired driver's license or, if applicable for UCC financing statements, identification card issued by Debtor's state of principal residence, and the address of Debtor's principal residence is as set forth below Section 5. If Debtor is an organization that has only one place of business, the address of Debtor's place of business, or if Debtor has more than one place of business, then the address of Debtor's chief executive office, is as set forth below Section 5.

**(k) Location.** The address where the Collateral will be kept, if different from that appearing below Section 5, is

_____ .

Such location shall not be changed without prior written consent of Lender, but the parties intend that the Collateral, wherever located, is covered by this Agreement.

**(l) Organization.** If Debtor is an organization, the type of organization and the state under whose law it is organized are as set forth below Section 5.

**(m)Environmental laws.** (i) No substance has been, is or will be present, used, stored, deposited, treated, recycled or disposed of on, under, in or about any real estate now or at any time owned or occupied by Debtor ("**Property**") during the period of Debtor's ownership or use of the Property in a form, quantity or manner which if known to be present on, under, in or about the Property would require clean-up, removal or some other remedial action ("**Hazardous Substance**") under any federal, state or local laws, regulations, ordinances, codes or rules ("**Environmental Laws**"), (ii) Debtor has no knowledge, after due inquiry, of any prior use or existence of any Hazardous Substance on the Property by any prior owner of or person using the Property, (iii) without limiting the generality of the foregoing, Debtor has no knowledge, after due inquiry, that the Property contains asbestos, polychlorinated biphenyl components (PCBs) or underground storage tanks, (iv) there are no conditions existing currently or likely to exist during the term of this Agreement which would subject Debtor to any damages, penalties, injunctive relief or clean-up costs in any governmental or regulatory action or third-party claim relating to any Hazardous Substance, (v) Debtor is not subject to any court or administrative proceeding, judgment, decree, order or citation relating to any Hazardous Substance, and (vi) Debtor in the past has been, at the present is, and in the future will remain in compliance with all Environmental Laws. Debtor shall indemnify and hold harmless Lender, its directors, officers, employees and agents from all loss, cost (including reasonable attorneys' fees and legal expenses), liability and damage whatsoever directly or indirectly resulting from, arising out of, or based upon (1) the presence, use, storage, deposit, treatment, recycling or disposal, at any time, of any Hazardous Substance on, under, in or about the Property, or the transportation of any Hazardous Substance to or from the Property, (2) the violation or alleged violation of any Environmental Law, permit, judgment or license relating to the presence, use, storage, deposit, treatment, recycling or disposal of any Hazardous Substance on, under, in or about the Property, or the transportation of any Hazardous Substance to or from Property, or (3) the imposition of any governmental lien for the recovery of environmental clean-up costs expended under any Environmental Law. Debtor shall immediately notify Lender in writing of any governmental or regulatory action or third-party claim instituted or threatened in connection with any Hazardous Substance described above on, in, under or about the Property.

**(n) Employees.** There are no unpaid wages due employees of Debtor and there are no outstanding liens against assets of Debtor for unpaid wages due employees of Debtor.

**(o) Fixtures.** If any of the Collateral is affixed to real estate, the legal description of the real estate set forth in each UCC Financing Statement signed or authorized by Debtor is true and correct.

### 3. SHIPPERS

Shippers authorized to draw drafts on Lender under section 7(c) are:

### 4. SALE AND COLLECTIONS

**(a) Sale of Inventory.** So long as no default exists under any of the Obligations or this Agreement, Debtor may (a) sell inventory in the ordinary course of Debtor's business for cash or on terms customary in the trade, at prices not less than any minimum sale price shown on instruments evidencing Obligations and describing inventory, or (b) lease or license inventory on terms customary in the trade.

**(b) Verification and notification.** Lender may verify Collateral in any manner, and Debtor shall assist Lender in so doing. Upon default Lender may at any time and Debtor shall, upon request of Lender, notify the account debtors or other persons obligated on the Collateral to make payment directly to Lender and Lender may enforce collection of, settle, compromise, extend or renew the indebtedness of such account debtors or other persons obligated on the Collateral. Until account debtors or other persons obligated on the Collateral are so notified, Debtor, as agent of Lender, shall make collections and receive payments on the Collateral.

**(c) Deposit with Lender.** At any time Lender may require that all proceeds of Collateral received by Debtor shall be held by Debtor upon an express trust for Lender, shall not be commingled with any other funds or property of Debtor and shall be turned over to Lender in precisely the form received (but endorsed by Debtor if necessary for collection) not later than the business day following the day of their receipt. Except as provided in Section 4(d) below, all proceeds of Collateral received by Lender directly or from Debtor shall be applied against the Obligations in such order and at such times as Lender shall determine.

**(d) Accounting.** If the extent to which Lender's security interest in the Collateral is a purchase money security interest depends on the application of a payment to a particular obligation of Debtor, the payment shall first be applied to obligations of Debtor for which Debtor did not create a security interest in the order in which those obligations were incurred and then to obligations of Debtor for which Debtor did create a security interest, including the Obligations secured by the Collateral, in the order in which those obligations were incurred; provided, however, that Lender shall retain its security interest in all Collateral regardless of the allocation of payments.

## 5. PERSONS BOUND AND OTHER PROVISIONS

Each person signing this Agreement is a Debtor. All Debtors are jointly and severally liable under this Agreement. This Agreement benefits Lender, its successors and assigns, and binds Debtor(s) and their respective heirs, personal representatives, successors and assigns and shall bind all persons and entities who become bound as a debtor to this Agreement. All security interests granted Lender under existing security agreements between Debtor and Lender shall remain in full force and effect in accordance with their terms, provided, however, if checked here ☐, this Agreement amends and restates in their entirety the provisions of all existing General Business Security Agreements between Debtor and Lender except that the security interests granted to Lender under those existing security agreements shall remain in full force and effect but subject to the provisions of this Agreement. Debtor acknowledges receipt of a completed copy of this Agreement. **THIS AGREEMENT INCLUDES THE ADDITIONAL PROVISIONS ON PAGES 3 & 4.**

_____(SEAL)     By: _____
                     DEBTOR

_____(SEAL)     (_____)
                     DEBTOR                                                         TITLE

Address: _____     * _____
              SEE SECTION 2(j) and (k)

_____     By: _____

(_____)     (_____)
              TYPE OF ORGANIZATION                                                  TITLE

                                                     * _____

## 6. DEBTOR'S COVENANTS

**(a) Maintenance of Collateral.** Debtor shall: maintain the Collateral in good condition and repair and not permit its value to be impaired; keep it free from all liens, encumbrances and security interests except those under Lender's security interest); defend it against all claims and legal proceedings by persons other than Lender; pay and discharge when due all taxes, license fees, levies and other charges upon it; not sell, lease, license or otherwise transfer or dispose of it or permit it to become a fixture or an accession to other goods, except for sales, leases or licenses of inventory as provided in this Agreement; not permit it to be used in violation of any applicable law, regulation or policy of insurance; and, as to Collateral consisting of instruments, chattel paper and letter of credit rights, preserve rights in it against prior parties. Loss of or damage to the Collateral shall not affect the liabilities of any Debtor or Borrower under this Agreement, the Obligations or other rights of Lender with respect to the Collateral.

**(b) Insurance.** Debtor shall keep the Collateral and Lender's interest in it insured under policies with such provisions, for such amounts and by such insurers as shall be satisfactory to Lender from time to time, and shall furnish evidence of such insurance satisfactory to Lender. Subject to Lender's satisfaction, Debtor is free to select the insurance agent or insurer through which the insurance is obtained. Debtor assigns (and directs any insurer to pay) to Lender the proceeds of all such insurance and any premium refund, and authorizes Lender to endorse in the name of Debtor any instruments for such proceeds or refunds and, at the option of Lender, to apply such proceeds and refunds to any unpaid balance of the Obligations, whether or not due, and/or to restoration of the Collateral, returning any excess to Debtor. Each insurance policy shall contain a standard lender's loss payable endorsement in favor of Lender, and shall provide that the policy shall not be cancelled, and the coverage shall not be reduced, without at least 10 days' prior written notice by the insurer to Lender. Lender is authorized, in the name of Debtor or otherwise, to make, adjust and/or settle claims under any credit insurance financed by Lender or any insurance on the Collateral, or cancel the same after the occurrence of an event of default. If Debtor fails to keep any required insurance on the Collateral, Lender may purchase such insurance for Debtor, such insurance may be acquired by Lender solely to protect the interest of Lender (and will not cover Debtor's equity in the Collateral), and Debtor's obligation to repay Lender shall be in accordance with Section 7(a).

**(c) Maintenance of security interest.** Debtor shall pay all expenses and upon request, take any action reasonably deemed advisable by Lender to preserve the Collateral or to establish, evidence, determine and maintain priority of, perfect, continue perfected, terminate and/or enforce Lender's interest in it or rights under this Agreement. Debtor authorizes Lender to file Uniform Commercial Code financing statements describing the Collateral (including describing the Collateral as "all assets" or with words of similar effect) and amendments and correction statements to such financing statements and ratifies any such financing statement or amendment filed prior to the date of this Agreement. Debtor will obtain for and provide to Lender control of Collateral or other security for the Obligations for which control may be required or requested to perfect Lender's security interest under applicable law, including, without limitation, the execution of control agreements by and between Debtor, Lender and any necessary third party. If the Collateral is in possession of a third party, Debtor will also join with Lender at its request in notifying the third party of Lender's security interest and obtaining an acknowledgment from the third party that it is holding the Collateral for the benefit of Lender.

**(d) Taxes and other charges.** Debtor shall pay and discharge all lawful taxes, assessments and government charges upon Debtor or against its properties prior to the date on which penalties attach, unless and to the extent only that such taxes, assessments and charges are contested in good faith and by appropriate proceedings by Debtor.

**(e) Employees.** Debtor shall pay all wages when due to employees of Debtor and shall not permit any lien to exist against the assets of Debtor for unpaid wages due employees of Debtor.

**(f) Records and statements.** Debtor shall furnish to Lender financial statements at least annually and such other financial information respecting Debtor at such times and in such form as Lender may request. Debtor shall keep accurate and complete records respecting the Collateral in such form as Lender may approve. At such times as Lender may require, Debtor shall furnish to Lender a statement certified by Debtor and in such form and containing such information as may be prescribed by Lender, showing the current status and value of the Collateral. Debtor shall furnish to Lender such reports regarding the payment of wages to employees of Debtor and the number of employees of Debtor as Lender may from time to time request, and without request shall furnish to Lender a written report immediately upon any material increase in the number of employees of Debtor, the failure of Debtor to pay any wages when due to employees of Debtor or the imposition of any lien against the assets of Debtor for unpaid wages due employees of Debtor.

**(g) Inspection of Collateral.** At reasonable times Lender may examine the Collateral and Debtor's records pertaining to it, wherever located, and make copies of records, and Debtor shall assist Lender in so doing.

**(h) Service charge.** In addition to the required payments under the Obligations and this Agreement, Debtor shall pay Lender's then current service charges for servicing and auditing in connection with this Agreement.

**(i) Chattel paper.** Lender may require that chattel paper constituting Collateral shall be on forms approved by Lender. Unless it consists of electronic chattel paper, Debtor shall promptly mark all chattel paper constituting Collateral, and all copies, to indicate conspicuously Lender's interest and, upon request, deliver them to Lender. If it consists of electronic chattel paper, Debtor shall promptly notify Lender of the existence of the electronic chattel paper and, at the request of Lender, shall take such actions as Lender may reasonably request to vest in Lender control of such electronic chattel paper under applicable law.

**(j) United States contracts.** If any Collateral arose out of contracts with the United States or any of its departments, agencies or instrumentalities, Debtor will notify Lender and execute writings required by Lender in order that all money due or to become due under such contracts shall be assigned to Lender and proper notice of the assignment given under the Federal Assignment of Claims Act.

**(k) Modifications.** Without the prior written consent of Lender, Debtor shall not alter, modify, extend, renew or cancel any accounts, letter of credit rights or chattel paper constituting Collateral.

**(l) Returns and repossessions.** Debtor shall promptly notify Lender of the return to or repossession by Debtor of goods underlying any Collateral and Debtor shall hold and dispose of them only as Lender directs.

**(m) Promissory Notes, Chattel Paper and Investment Property.** If Debtor shall at any time hold or acquire Collateral consisting of promissory notes, chattel paper or certificated securities, Debtor shall endorse, assign and deliver the same to Lender accompanied by such instruments of transfer or assignment duly executed in blank as Lender may from time to time request.

**(n) Change of name, address or organization.** Debtor shall not change (i) Debtor's legal name, (ii) if Debtor is an individual Debtor's name as it is indicated on Debtor's current unexpired driver's license or, if applicable for UCC financing statements, identification card issued by Debtor's state of principal residence, or (iii) Debtor's address, in each case without providing at least 30 days' prior written notice of the change to Lender. If Debtor is an individual, Debtor shall provide to Lender at least 30 days' written notice of any expiration of Debtor's driver's license or, if applicable for UCC financing statements, identification card issued by Debtor's state of principal residence. If Debtor is an organization it shall not change its type of organization or state under whose law it is organized and shall preserve its organizational existence, and Debtor whether or not Debtor is an organization shall not, in one transaction or in a series of related transactions, merge into or consolidate with any other organization, change Debtor's legal structure or sell or transfer all or substantially all of Debtor's assets.

## 7. RIGHTS OF LENDER

**(a) Authority to perform for Debtor.** Upon the occurrence of an event of default or if Debtor fails to perform any of Debtor's duties set forth in this Agreement or in any evidence of or document relating to the Obligations, Lender is authorized, in Debtor's name or otherwise, but is not obligated, to take any such action including without limitation signing Debtor's name or paying any amount so required, and the cost shall be one of the Obligations secured by this Agreement and shall be payable by Debtor upon demand with interest from the date of payment by Lender at the highest rate stated in any evidence of any Obligation but not in excess of the maximum rate permitted by law.

**(b) Charging a Debtor's credit balance.** Unless a lien would be prohibited by law or would render a nontaxable account taxable, Debtor who is also a Borrower grants Lender, as further security for the Obligations, a security interest and lien in any deposit account such Debtor may at any time have with Lender and other money now or hereafter owed such Debtor by Lender, and agrees that Lender may, at any time after the occurrence of an event of default, without prior notice or demand, set-off all or any part of the unpaid balance of the Obligations against any deposit balances or other money now or hereafter owed such Debtor by Lender.

**(c) Power of attorney.** Debtor irrevocably appoints any officer of Lender as Debtor's attorney, with power after an event of default to receive, open and dispose of all mail addressed to Debtor (and Lender shall not be required as a condition to the exercise of this power to prove the occurrence of an event of default to the Post Office); to notify the Post Office authorities to change the address for delivery of all mail addressed to Debtor to such address as Lender may designate; to endorse the name of Debtor upon any instruments which may come into Lender's possession; and to sign and make draws under any letter of credit constituting Collateral on Debtor's behalf. Debtor agrees that Obligations may be created by drafts drawn on Lender by shippers of inventory named in Section 3. Debtor authorizes Lender to honor any such draft accompanied by invoices aggregating the amount of the draft and describing inventory to be shipped to Debtor and to pay any such invoices not accompanied by drafts. Debtor appoints any employee of Lender as Debtor's attorney, with full power to sign Debtor's name on any instrument evidencing an Obligation, or any renewals or extensions, for the amount of such drafts honored by Lender and such instruments may be payable at fixed times or on demand, shall bear interest at the rate from time to time fixed by Lender and Debtor agrees, upon request of Lender, to execute any such instruments. This power of attorney to execute instruments may be revoked by Debtor only by written notice to Lender and no such revocation shall affect any instruments executed prior to the receipt by Lender of such notice. All acts of such attorney are ratified and approved and such attorney is not liable for any act or omission or for any error of judgment or mistake of fact or law. This power is a power coupled with an interest and is given as security for the Obligations, and the authority conferred by this power is and shall be irrevocable and shall remain in full force and effect until renounced by Lender except as otherwise expressly provided in this Section 7(c).

**(d) Non-liability of Lender.** Lender has no duty to determine the validity of any invoice, the authority of any shipper named in Section 3 to ship goods to Debtor or compliance with any order of Debtor. Lender has no duty to protect, insure, collect or realize upon the Collateral or preserve rights in it against prior parties. Debtor releases Lender from any liability for any act or omission relating to the Obligations, the Collateral or this Agreement, except Lender's willful misconduct.

DocuSign Envelope ID: 9375A531-E95A-4DC0-A85E-349F0D54A045

**8. DEFAULT**

Upon the occurrence of one or more of the following events of default:

**(a) Nonperformance.** Any of the Obligations are not paid when due, or Borrower or Debtor, as applicable, fails to perform, or rectify breach of, any warranty or covenant or other undertaking in this Agreement or in any evidence of or document relating to the Obligations or an event of default occurs under any evidence of or document relating to any other obligation secured by the Collateral;

**(b) Inability to Perform.** Borrower, Borrower's spouse, Debtor or a guarantor or surety of any of the Obligations dies, ceases to exist, becomes insolvent or the subject of bankruptcy or insolvency proceedings or any guaranty of the Obligations is revoked or becomes unenforceable for any reason;

**(c) Misrepresentation.** Any warranty or representation made to induce Lender to extend credit to Debtor or Borrower, under this Agreement or otherwise, is false in any material respect when made; or

**(d) Insecurity.** At any time Lender believes in good faith that the prospect of payment or performance of any of the Obligations or performance under any agreement securing the Obligations is impaired;

all of the Obligations shall, at the option of Lender and without notice or demand, become immediately payable; and Lender shall have all rights and remedies for default provided by the Wisconsin Uniform Commercial Code and this Agreement, as well as any other applicable law, and under any evidence of or document relating to any Obligation, and all such rights and remedies are cumulative and may be exercised from time to time together, separately, and in any order. With respect to such rights and remedies:

**(e) Repossession.** Lender may take possession of Collateral without notice or hearing, which Debtor waives;

 **(f) Assembling Collateral.** Lender may require Debtor to assemble the Collateral and to make it available to Lender at any place reasonably designated by Lender;

**(g) Notice of disposition.** Written notice, when required by law, sent to any address of Debtor in this Agreement at least I0 calendar days (counting the day of sending) before the date of a proposed disposition of the Collateral is reasonable notice;

**(h) Expenses and application of proceeds.** Debtor shall reimburse Lender for any expense incurred by Lender in protecting or enforcing its rights under this Agreement, before and after judgment, including, without limitation, reasonable attorneys' fees and legal expenses (including those incurred in successful defense or settlement of any counterclaim brought by Debtor or incident to any action or proceeding involving Debtor brought pursuant to the United States Bankruptcy Code) and all expenses of taking possession, holding, preparing for disposition and disposing of Collateral (provided, however, Lender has no obligation to clean-up or otherwise prepare the Collateral for sale). After deduction of such expenses, Lender shall apply the proceeds of disposition to the extent actually received in cash to the Obligations in such order and amounts as it elects or as otherwise required by this Agreement. If Lender sells any Collateral on credit, Debtor will be credited only with payments that the purchaser actually makes and that Lender actually  receives and applies to the unpaid balance of the purchase price of the Collateral; and

 **(i)  Waiver.** Lender may permit Debtor or Borrower to remedy any default without waiving the default so remedied, and Lender may waive in writing any default without waiving any other subsequent or prior default by Borrower or Debtor. Lender shall continue to have all of its rights and remedies under this Agreement even if it does not fully and properly exercise them on all occasions.

**9. WAIVER AND CONSENT**

Each Debtor who is not also a Borrower expressly consents to and waives notice of the following by Lender without affecting the liability of any such Debtor: (a) the creation of any present or future Obligation, default under any Obligation, proceedings to collect from any Borrower or anyone else, (b) any surrender, release, impairment, sale or other disposition of any security or collateral for the Obligations, (c) any release or agreement not to sue any guarantor or surety of the Obligations, (d) any failure to perfect a security interest in or realize upon any security or collateral for the Obligations, (e) any failure to realize upon any of the Obligations or to proceed against any Borrower or any guarantor or surety, (f) any renewal or extension of the time of payment, (g) any allocation and application of payments and credits and acceptance of partial payments, (h) any application of the proceeds of disposition of any collateral for the Obligations to any obligation of any Debtor or Borrower secured by such collateral in such order and amounts as it elects, (i) any determination of what, if anything, may at any time be done with reference to any security or collateral, and (j) any settlement or compromise of the amount due or owing or claimed to be due or owing from any Borrower, guarantor or surety.

**10. INTERPRETATION**

The validity, construction and enforcement of this Agreement are governed by the internal laws of Wisconsin except to the extent such laws are preempted by federal law. All terms not otherwise defined have the meanings assigned to them by the Wisconsin Uniform Commercial Code, as amended from time to time, provided, however, that the term "**instrument**" shall be such term as defined in the Wisconsin Uniform Commercial Code-Secured Transactions Chapter 409. All references in this Agreement to sections of the Wisconsin Statutes are to those sections as they may be renumbered from time to time. Invalidity of any provision of this Agreement shall not affect the validity of any other provision.

**11. ENTIRE AGREEMENT**

THIS AGREEMENT IS INTENDED BY LENDER AND DEBTOR AS A FINAL EXPRESSION OF THIS AGREEMENT AND AS A COMPLETE AND EXCLUSIVE STATEMENT OF ITS TERMS, THERE BEING NO CONDITIONS TO THE ENFORCEABILITY OF THIS AGREEMENT, AND THIS AGREEMENT MAY NOT BE CONTRADICTED OR VARIED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR DISCUSSIONS OF THE PARTIES TO THIS AGREEMENT. THERE ARE NO ORAL AGREEMENTS AMONG THE PARTIES TO THIS AGREEMENT. THIS AGREEMENT MAY NOT BE SUPPLEMENTED OR MODIFIED EXCEPT IN WRITING SIGNED BY LENDER AND DEBTOR.

**12. OTHER PROVISIONS**

(If none stated below, there are no other provisions.)

ActiveCampaign
1 N Dearborn 5th Floor
Chicago, IL 60602

Adobe Inc.
345 Park Avenue
San Jose, CA 95110-2704

AJW Technology Consulting
Breite Strabe 3, 40213
Dusseldorf, Germany

Amazon Web Services, Inc.
410 Terry Ave North
Seattle, WA 98109

Amendola Communications
9280 E. Raintree Dr. Ste. 104
Scottsdale, AZ 85260

Aramark Refreshments Services
3506 McAllens Wy
Madison, WI 53718

Atlassian, Inc.
350 Bush Street Floor 13
San Francisco, CA 94104

Baker Tilly US, LLP
2201 E Enterprise Ave Suite 100
Appleton, WI 54912

BDO
One Erdman Place, Suite 404
Madison, WI 53717

Beyond LLC
1875 Merlot Dr.
Sanford, FL 32771

Brex, Inc.
405 Howard Street
San Francisco, CA 94105

BSI Group America Inc.
12950 Worldgate Dr Suite 800
Herndon, VA 20170

CapeStart, Inc.
60 Thoreau Street, Suite 294
Concord, MA 01742

Carta
333 Bush Street, Floor 23
San Francisco, CA 94104

Cloudticity
P.O. Box 252172
West Bloomfield, MI 48325

Concur Technologies, Inc.
601 108th Avenue NE, Suite 1000
Bellevue, WA 98004

Crunchbase
564 Market St #700
San Francisco, CA 94104

DataDog
620 8th Avenue, 45th Floor
New York, NY 10018

Dirgis Professional Services
302 S. Owen Dr.
Madison, WI 53705

DocuSign, Inc.
221 Main Street Suite 1000
San Francisco, CA 94105

Dropbox, Inc.
333 Brannan Street
San Francisco, CA 94107

Epic
1979 Milky Way
Verona, WI 53593

FedEx
942 South Shady Grove Road
Memphis, TN 38120

GMDN Agency
Park House Milton Park, Abingdon

Oxfordshire OX14 4RS, United Kingdon

GoDaddy
14455 North Hayden Road Suite 219
Scottsdale, AZ 85260

Google, Inc.
1600 Amphitheatre Parkway
Mountain View, CA 94043

Gurock Software GmbH
Sudliche Ringstrabe 175
63225 Langen, Germany

HiTrust
6175 Main Astreet Suite 400
Frisco, TX 75034

Hoostsuite
111 E 5th Ave
Vancouver, Canada

iDeals Virtual
815 N Royal Street, Sutie 202
Alexandria, VA 22314

Innovenn, Inc.
6410 Enterprise Lane Suite 230
Madison, WI 53719

JetBrtains Americas, Inc.
989 East Hillsdale Blvd Sutie 200
Foster City, CA 94404

Kahoots Creative Group Inc.
4541 N. Ravenswood Ave. Suite #204
Chicago, IL 60640

Kakadu Software Pty Ltd
P.O. Box 1004
Glebe NSW 2037, Australia

Klipfolio Inc.
111 Albert St. Suite 300
Ottawa ON K1P 1AD, Canada

Lab Exhibits & Services

1455 Sequoia Dr Ste 105
Aurora, IL 60506

Liberty Mutual Insurance
P.O. Box 188025
Fairfield, OH 45018-8025

LinkedIn Corporation
605 W Maude Ave
Sunnyvale, CA 94085

Lionbridge Technologies, LLC
1050 Winter Street Suite 2300
Waltham, MA 02451

Lucidchart
10355 South Jordan Gateway Suite 150
Utah, NV 84095

Medasource
P.O. Box 55767
Indianapolis, IN 46205

Michael Best & Fdriedrich LLP
One South Pinckney Street Sutie 700
Madison, WI 53701

Microsoft
One Microsoft Way
Redmond, WA 98052

Office Timeline
1400 112th Ave SE, Suite 100
Bellevue, WA 98004

Okta Inc.
P.O. Box 743620
Los Angeles, CA 90074-3620

Peter Hoban Consulting
2 Baytree Close
Exeter, Devon, EX66NS, United Kingdon

Peter Rackley
64 Pine Tree LN
Raynham, MA 02767-5122

Premier Retirement Partners LLC
8040 Excelsior Drive, Suite 401
Madison, WI 53717

ProofHub
340 S Lemon Ave
Walnut, California 91789

Ranorex Inc.
2950 N Loop Freeway West, Suite 700
Houston, TX 77092

RingCentral
20 Davis Dr
Belmont, CA 94002

RSNA
820 Jorie Blvd, Suite 200
Oak Brook, IL 60523-2251

Sage Software, Inc.
271 17th St NW Ste 1100
Atlanta, GA 30363-6201

Salesforece.com, Inc.
415 Mission Street, 3rd Floor
San Francisco, CA 94105

SecureLink
11402 Bee Cave Rd
Austin, TX 78738

Skyline Service, Inc
3040 Laura Ln. Suite 110
Middleton, WI 53562

SmallPDF
Steinstrasse 21 Zurich
Zurich, 8003, Switzerland

Smartsheet Inc.
10500 NE 8th Street, Suite 1300
Bellevue, WA 98004

Snowflake Inc.
P.O. Box 734951
Dallas, TX 75373-4951

SpectraMedEx, LLC
3215 Golf Road, #19
Delafield, WI 53018

T.Rowe Price Retirement Plan Services
P.O. Box 64012
Baltimore, MD 21264-4012

TDS Telecommunications LLC
525 Junction Road
Madison, WI 53717

TeamSupport LLC
8330 Lyndon B Johnson Fwy, Suite 1100
Dallas, TX 75243

The Gialamas Company, Inc
8040 Excelsior Drive, Suite 200
Madison, WI 53717

Thomas Bradley Insurance
1001 Fourier Dr. Ste 100
Madison, WI 53717

Thompson Investment
1255 Fourier Dr, Suite 200
Madison, WI 53717-2176

Toggl Track
Tallinn, Estonia

US Food and Drug Administration
10903 New Hampshire Avenue
Silver Spring, MD 20993

Vanderbilt Universit Medical Center
1161 21st Avenue South
Nashville, TN 37232

Vensure Employer Services
2600 W. Geronimo Place, Sutie 100
Chandler, AZ 85224

VeraSafe, LLC
22 Essex Way #8203
Essex, VT 05451

Wisconsin Economic Deelopment Corporation
201 W Washington Avenue
Madison, WI 53703

Zoom
55 Almaden Blvd
San Jose, CA 95111

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WISCONSIN

In re:

HEALTHMYNE, INC.

Case No.
Chapter 11 Proceedings

Debtor.

## DECLARATION OF ROSE HIGGINS

I, Rose Higgins, declare that the following statements are true and correct to the best of my knowledge, information, and belief:

1.    I am the person authorized on behalf of HealthMyne, Inc. (the "**Debtor**") to act on behalf of the Debtor in these proceedings.

2.    Pursuant to 11 U.S.C. § 1116, attached are true and correct copies of:

   (a)    The Debtor's latest Balance Sheet;

   (b)    The Debtor's latest Cash Flow Statement;

   (c)    The Debtor's Statement of Operations;

   (d)    The Debtor's 2020 Federal Income Tax Return (under seal).

Dated: May 15, 2022.

**HealthMyne, Inc.**

Rose Higgins
Its: Authorized Representative