# UNITED STATES BANKRUPTCY COURT
# WESTERN DISTRICT OF WISCONSIN

In re:

HEALTHMYNE, INC.,

Debtor.

Case No. 22-10780
Chapter 11 Proceedings

## DECLARATION OF ROSE HIGGINS IN SUPPORT OF FIRST-DAY MOTIONS

I, Rose Higgins, hereby declare under penalty of perjury, that the following is true and correct to the best of my knowledge, information, and belief:

### Background

1. I am the Chief Executive Officer of HealthMyne, Inc., the Debtor in these proceedings. I have held my position or an equivalent role since January 1, 2020. Accordingly, I am familiar with the Debtor's day-to-day operations, business, financial affairs, and books and records. I am authorized to act on behalf of the Debtor and I submit this Declaration in support of the Debtor's first-day motions filed in this case to, among other things, approve the Debtor's requests to (a) auction and sell substantially all of the debtor's assets (the "**Bidding Procedures Motion**"), (b) continue to manage its existing bank accounts with Silicon Valley Bank (the "**Cash Management Motion**"), and (c) borrow money on a post-petition basis from certain insider-lenders (the "**DIP Financing Motion**"). If called upon to testify, I could and would testify as to the facts and statements set forth herein.

2. HealthMyne is an innovative leader in radiomics, primarily serving the

oncology market. The Debtor has developed technology-enabled software solutions with the use of artificial intelligence, which can convert imaging data into useful tools to treat complex diseases like cancer.

3. The Debtor's products serve to mine radiomic data, create workflow solutions for personalized medical care, and provide storage and data organization for scientific analysis and disease research.

4. The Debtor has developed relationships with clinics (e.g., clinical operators, health research) and commercial businesses (e.g., life sciences, medical devices) and generates revenues by providing and/or licensing its software and products, providing data storage and infrastructure for medical images, developing workflow modules, and providing ongoing support and training to its customers.

5. The Debtor anticipates significant revenue growth over the next 3-5 years within the $250 billion global oncology market. Radiomics plays a critical role in personalized oncology care and therapy development and is essential to meet the growing needs of the market.

6. The Debtor believes that its products and services have significant upside potential and would be a valuable asset for a prospective purchaser.

**Marketing Efforts and Proposed Bidding Procedures**

7. Since November of 2021, HealthMyne has been working with Convergence Healthcare Advisors LLC ("**Convergence**") to market and sell the company and/or its assets to interested purchasers. Convergence solicited marketing materials to over 100 target companies. In response, over 30 parties executed non-disclosure agreements, and

as of the Petition Date, over a half-dozen prospects remain in active conversation with Convergence regarding a sale transaction.

8. With no remaining equity infusions, the Debtor believed that filing this case provided the best and most efficient way to sell the business in a short timeframe while providing interested buyers with the various benefits of a bankruptcy sale.

9. In the weeks leading up to the bankruptcy filing, HealthMyne (through its counsel) renegotiated the terms of the Convergence agreement, which among other things, altered the success fee from a flat amount of $850,000 to a percentage fee of 4-6% of the eventual sale price. I believe that the resulting amended engagement with Convergence is fair and reasonable under the circumstances, in particular because the success fee to be paid to Convergence will only be earned in the event of a sale.

10. I also appreciate that for HealthMyne to have the best chance to pursue a value-maximizing transaction, it is in the Debtor's best interest to continue its relationship with Convergence, who can quickly rebroadcast the bidding and auction procedures to its targeted marketing list. I ultimately believe that the renegotiated contract with Convergence will minimize disruption through what we anticipate will be a quick sale process.

11. Leading up to the filing of this case, HealthMyne (through Convergence) continued to have ongoing conversations with interested parties, some of whom indicated that a letter of intent would be forthcoming. I believe that there is a good chance that one of these interested parties may, with the added benefits of a break-up fee, serve as a "stalking horse" bidder at the anticipated auction.

12. In consultation with Michael Best and Convergence, I have reviewed the Bidding Procedures and believe that the proposed process and timeline is fair and appropriate, and will allow the Debtor to proceed expeditiously with any sale.

### The Cash Management Motion

13. The Debtor maintains an operating bank account at Silicon Valley Bank ending in *3204 and a "cash sweep" money market bank account at Silicon Valley Bank ending in *4419.

14. The Debtor utilizes the accounts to collect and disburse funds generated by the operations of the Debtor, monitor the collection and disbursement of funds, and maintain control over them. Daily deposits made to the operating account are immediate swept into the money market account which bears interest at a higher rate. As disbursements are made by check from the operating account, a corresponding redemption sweep is triggered which pulls necessary funds back from the money market balance.

15. A number of the Debtor's customers make payments to the Debtor via online bill pay, electronic transfer, or mobile deposit. Forcing these customers to move to a new bank account for the short duration of this case does not seem warranted or beneficial under the circumstances.

16. Prior to the Petition Date, the Debtor (through counsel), negotiated an agreement with Silicon Valley Bank regarding the use of cash collateral during the course of what we anticipate to be a rather quick sale process. That agreement includes keeping our bank account with Silicon Valley Bank, and seeking approval from the Court to

maintain the existing accounts.

17. Given the current cash flows of the Debtor as reflected in the budget and the anticipated short duration of this case, it is highly unlikely that the Debtor's bank accounts will have over the $250,000 FDIC limit.

18. Additionally, prior to this Case, the Debtor canceled any ACH and other automatic withdrawals; as such, there is little risk that any pre-petition obligation will be paid accidentally.

19. In the event of a successful sale that generates proceeds for the estate, the Debtor can set up a separate bank account at an authorized depository to hold all sales proceeds that are above the FIDC insurance limit.

## The DIP Financing Motion

20. The Debtor has an immediate and critical need for post-petition financing as requested in the DIP Financing Motion to continue its ongoing business operations during the pendency of this bankruptcy case until such time as a sale can be consummated with an interested buyer. Without the funding, I believe that HealthMyne will lack sufficient resources to continue such operations or otherwise pursue its efforts through a sale process to maximize value to creditors.

21. As set forth in the DIP Financing Motion, the Debtor has prepared a cashflow forecast for next two months, and pursuant to that budget, the Debtor intends to deploy the proceeds of the loan and cash collateral (with the consent of Silicon Valley Bank) to secure and preserve its assets, continue operations as a going-concern, fund professional fees, and ultimately to implement a strategy to maximize value through a

5

sale.

22. The loan (the "**DIP Loan**") proposed under the DIP Financing Motion is from three lenders (the "**DIP Lenders**"): (1) CHV IV, L.P., (2) Venture Investors Early Stage Fund V, L.P., and (3) 4490 Ventures, L.P. Each of the lenders are "insiders" of the Debtor because they hold positions on the Debtor's board of directors and they are owners of voting securities of the Debtor.

23. Each loan is secured by a blanket lien against the Debtor's assets, but is junior and subordinate to Silicon Valley Bank's senior loan position. The loans accrue interest at a rate of 8% per annum, but no payments are due and owing to the DIP Lenders during the course of these proceedings.

24. Pursuant to that certain Second Amendment to Convertible Promissory Note Purchase Agreement among the Debtor and the DIP Lenders, the DIP Loan was set up to have multiple funding tranches with a maximum principal amount of $1,000,000. The first tranche of $500,000 was loaned to the Debtor in March of 2022; the second tranche of $170,000 was loaned to the Debtor on or around May 11, 2022, the week before the Petition Date. For all amounts loaned under the Second Amendment to the Convertible Promissory Note Purchase Agreement, 50% of the funds was provided by CHV IV, L.P., 25% was provided by Venture Investors Early Stage Fund V, L.P., and 25% was provided by 4490 Ventures, L.P.

25. The proposed third tranche will be provided to the Debtor on a post-Petition Date basis, which is the reason for the Debtor's filing of the DIP Financing Motion. The post-petition tranche is available in each of the DIP Lender's sole discretion

at any time prior to December 31, 2022, provided that the Debtor's obtains approval of the proposed DIP Loan, continues to comply with the post-petition budget supplied to the DIP Lenders, and continues to progress with the proposed auction and sale process set forth in the Bidding Procedures.

26. The maximum borrowing under the DIP Loan (the third tranche) is $330,000; however, unless and until there are meaningful developments with a stalking horse bidder or the Debtor receives qualified bids, the DIP Lenders have limited the Debtor's post-petition borrowing to an aggregate amount of $45,000, which is the amount of funding necessary for the Debtor through July 1, 2022.

27. The terms of the DIP Loan cannot be obtained elsewhere. Under the circumstances present in this case, it would be impossible for the Debtor to obtain a subordinated loan, with no points or fees, with payment-in-kind interest only at 8%, from anywhere other than its own investors.

28. I believe that the proposed terms of the DIP Loan are reasonable, fair, and cannot reasonably be obtained elsewhere. The DIP Loan provides the Debtor with necessary cash to pursue its sale strategy on a relatively quick timeframe.

Dated: May 16, 2022.

*s/ Rose Higgins*
Rose Higgins, CEO